**No. 23-13272**

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE ELEVENTH CIRCUIT

Antonio Hall

*Plaintiff-Appellant*

v.

SAC Wireless, LLC

*Defendant-Appellee*

Appeal from the United States District Court
for the Northern District of Georgia

No. 1:21-cv-05241-JPB

## APPELLANT'S OPENING BRIEF

Warshauer Woodward Atkins LLC
Michael J. Warshauer
Trent Shuping
William J. Atkins
2740 Bert Adams Road
Atlanta, GA 30339
404-892-4900
mjw@warlawgroup.com
tss@warlawgroup.com
bill@warlawgroup.com

Attorneys for Appellant
Antonio Hall

# <u>Certificate of Interested Persons</u>

The undersigned certifies that the following is a complete list of all trial judges, attorneys, persons, associations of persons, firms, partnerships, or corporations known to the Plaintiff-Appellant to have an interest in the outcome of the particular case or appeal, including subsidiaries, conglomerates, affiliates, parent corporations, any publicly held corporation that owns 10% or more of the party's stock, and other identifiable legal entities related to a party:

1.  Atkins, William J. (counsel for Plaintiff-Appellant);

2.  Coleman, Kimberly (counsel for Defendant-Appellee);

3.  Drew Eckl & Farnham, LLP (law firm of counsel for Defendant-Appellee);

4.  Honorable J.P. Boulee (District Court Judge);

5.  Horowitz, Andrew D. (counsel for Defendant-Appellee);

6.  Nokia of America Corporation (whole owner of Defendant-Appellee);

7.  Roberts, Cliff Lee (counsel for Plaintiff-Appellant);

8.  Roberts Law Office (law firm of counsel for Plaintiff-Appellant);

9.  SAC Wireless, LLC (Defendant-Appellee);

10. Shuping, Trent (counsel for Plaintiff-Appellant);

11.     Warshauer, Michael J. (counsel for Plaintiff-Appellant);

12.     Warshauer Woodward Atkins, LLC (law firm of counsel for Plaintiff-Appellant);

13.     XL Insurance America, Inc. (insurer for Defendant-Appellee).

## <u>Request for Oral Argument</u>

The Appellant requests oral argument. This case involves the application of the "statutory employer" provision of Georgia's Workers Compensation Act. It involves the application of statutory text to a complex fact pattern and its outcome has the potential to substantially affect Georgia workers and employers beyond those involved in the instant case.

# **Table of Contents**

Certificate of Interested Persons . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . C-1

Request for Oral Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . i

Table of Contents . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

Table of Citations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iv

Jurisdictional Statement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

    1.   District Court Jurisdiction . . . . . . . . . . . . . . . . . . . . . . . . . 1

    2.   Court of Appeals Jurisdiction . . . . . . . . . . . . . . . . . . . . . . . 4

Statement of the Issues . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

Statement of the Case . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

    1.   Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

    2.   Course of Proceedings and Disposition Below . . . . . . . . . 7

    3.   Statement of the Facts . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

Summary of the Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

    1.   The Plaintiff was not an employee of a "subcontractor.". .15

    2.   Plaintiff was not "engaged upon the subject matter of the contract to the same extent as the immediate employer." . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

Argument and Citation of Authorities . . . . . . . . . . . . . . . . . . . . . . . 17

    1.   Maxim was not a Subcontractor of SAC . . . . . . . . . . . . . 17

1.1    The Court must apply the plain and ordinary
       Definition of "Subcontractor". . . . . . . . . . . . . . . . . 18

1.2    Maxim was not SAC's Subcontractor . . . . . . . . . . 23

       1.2.1 Maxim did not contract to perform any
             part of SAC's contract . . . . . . . . . . . . . . . . . . 23

       1.2.2 Maxim did not provide "substantial
             services" to SAC . . . . . . . . . . . . . . . . . . . . . . 25

       1.2.3 A lessor of borrowed servants is not
             the same thing as a contractor. . . . . . . . . . . 26

       1.2.4 The district court failed to recognize the
             crane's operator was a borrowed servant
             of SAC. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

2.    Plaintiff was not engaged upon the subject matter
      of the contract to the same extent as the immediate
      employer . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

      2.1    The district court did not apply the statute
             as written. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

**Conclusion** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

**Certificate of Compliance** . . . . . . . . . . . . . . . . . . . . . . . . 40

## <u>Table of Citations</u>

**CASES**

*Brack v. CPPI of Ga., LLC*, 849 S.E.2d 521 (2020) ......... 21, 22, 25, 38, 39

*Carr v. FedEx Ground Package Sys., Inc.*, 317 Ga. App. 733, 733 S.E.2d 1 (2012) .............................................................................................. 36

*Corley v. United States*, 556 U.S. 303, 314, 129 S. Ct. 1558, 173 L. Ed. 2d 443 (2009) ........................................................................... 40

*Deal v. Coleman*, 294 Ga. 170, 172, 751 S.E.2d 337, 341 (2013) ............ 18

*Evans v. Hawkins*, 114 Ga. App. 120, 122, 150 S.E.2d 324, 326 (1966) 20

*Felker v. Tyson Foods, Inc.*, 2018 U.S. Dist. LEXIS 185960, 2018 WL 5649897 (M.D. Ga. Oct. 31, 2018) ............................................. 22, 23, 26

*Finley v. Lehman*, 218 Ga. App. 789, 789-90, 463 S.E.2d 709, 710 (1995) ................................................................................................. 38

*Gray Bldg. Sys. v. Trine*, 260 Ga. 252, 253 (1990) ...................... 23, 24, 27

*Int'l Leadburning Co. v. Forrister*, 213 Ga. App. 558 (1994) ............ 35, 36

*Landrum v. Cobb County Concrete Prods.*, 191 Ga. App. 805, 380 S.E.2d 726 (1989) ......................................................................................... 36

*Mallory & Evans Contractors & Eng'rs, LLC v. Tuskegee Univ.*, 663 F.3d 1304, 1305 (11th Cir. 2011) .......................................................... 2

*Patterson v. Bristol Timber Co.* 286 Ga. App. 423, 649 S.E.2d 795 (2007) ................................................................................................. 37

*Patton v. Vanterpool*, 302 Ga. 253, 256, 806 S.E.2d 493, 496 (2017) 17, 30

*Ray v. Bird & Son & Asset Realization Co.*, 519 F.2d 1081, 1082 (5th Cir. 1975) ......................................................................................... 3

*Reaves v. Columbus Elec. & Power Co.*, 32 Ga. App. 140 ...................... 15

iv

*Rolling Greens MHP, L.P. v. Comcast SCH Holdings L.L.C.*, 374 F.3d 1020, 1022-23 (11th Cir. 2004 ................................................................. 4

*Standard Oil Co. v. Anderson*, 212 U.S. 215, 221, 29 S. Ct. 252, 254 (1909 ................................................................................................... 29

*Tim's Crane & Rigging, Inc. v. Gibson*, 278 Ga. 796, 798, 604 S.E.2d 763, 765 (2004) ........................................................................ 28, 30, 31

*W. Elec. Co. v. Capes,* 296 S.E.2d 381, (1982) ....................................... 19

*Williams v. Best Buy Co.*, 269 F.3d 1316, 1319 (11th Cir. 2001) ............ 3

*Winston Corp. v. Park Elec. Co.*, 126 Ga. App. 489, 494, 191 S.E.2d 340, 344 (1972) ....................................................................................... 32

*Yoho v. Ringier of Am.*, 434 S.E.2d 57 (1993) ...................................... 20

**STATUTES**

28 U.S.C.S. § 1447 ..................................................................................... 3

49 U.S.C. § 1291 ....................................................................................... 4

O.C.G.A § 46-3-40 ..................................................................................... 8

O.C.G.A. § 34-9-11 .................................................................................. 17

O.C.G.A. § 46-3-33 .................................................................................... 8

**OTHER AUTHORITIES**

Black's Law Dictionary ........................................................................... 14

**TREATISES**

Scalia, A. and Garner, B., Reading Law – The Interpretation of Legal Texts, (2012), p. 93 ................................................................................ 23

**REGULATIONS**

29 C.F.R. § 1926.51(c)(1) ........................................................................ 21

## Jurisdictional Statement

**1.    District Court Jurisdiction**

Plaintiff/Appellant filed this case in the State Court of Gwinnett County, Georgia. Doc. 1 ¶1 and Doc. 1-1.

The Defendant/Appellee removed the case to the Northern District of Georgia. Doc. 1. The Defendant's sole basis for removal was a claim that diversity jurisdiction existed. Doc. 1 ¶6.

On November 11, 2023, this Court issued a Jurisdictional Question asking the parties to "address whether the relevant pleadings sufficiently allege the parties' citizenship so as to invoke the district court's diversity jurisdiction in the first instance." Doc. 14-2.

The Defendant/Appellee never responded to the Jurisdictional Question. The Plaintiff/Appellant timely responded and explained that while the record establishes that the Plaintiff is a citizen of Georgia, it fails to establish the citizenship of Defendant SAC Wireless, LLC. Doc. 16.

Although the Defendant's Notice of Removal only alleged that the Plaintiff is a "resident" of Georgia, his citizenship is established elsewhere in the record. Specifically, the Plaintiff's citizenship is alleged

in his Complaint Doc. 1-1 ¶1 and admitted in the Defendant's Answer Doc. 2 ¶1.

The citizenship of Defendant SAC Wireless, LLC was not properly alleged in the notice of removal. Paragraph 4 alleges that the Defendant LLC was formed under the laws of Oklahoma and has its principal place of business in the State of Illinois. Doc. 1 ¶4. However, no allegations are made concerning the citizenship of the members of the LLC. *Id.* See *Mallory & Evans Contractors & Eng'rs, LLC v. Tuskegee Univ.*, 663 F.3d 1304, 1305 (11th Cir. 2011) (to allege citizenship of LLC, party must list the citizenship of all of its members).

Here, the Notice of Removal alleges that Defendant SAC Wireless, LLC is a "wholly-owned subsidiary of Nokia of America Corporation" but does not identify the member or members of SAC Wireless, LLC. Doc. 1 ¶4.

Stating that Defendant is a wholly-owned subsidiary of Nokia of America Corporation does not establish Defendant's member(s). There could potentially be a layer or even several layers of entities between the LLC and Nokia, the corporation that ultimately owns it. Nothing in the

notice of removal nor in the current record of this case identifies Defendant's members or their citizenship.

Defendant, as the removing party, bears the burden of establishing the citizenship of the parties. *Williams v. Best Buy Co.*, 269 F.3d 1316, 1319 (11th Cir. 2001) ("Because this case was originally filed in state court and removed to federal court by [the Defendant], [the Defendant] bears the burden of proving that federal jurisdiction exists."); *Ray v. Bird & Son & Asset Realization Co.*, 519 F.2d 1081, 1082 (5th Cir. 1975) ("The burden of pleading diversity of citizenship is upon the party invoking federal jurisdiction[.]")

This Court's Jurisdictional Question required the parties to respond within fourteen days. The Defendant never responded or took any steps to meet its burden of establishing jurisdiction.

The Plaintiff, in his response to the Jurisdictional Question, moved that this case be remanded to the district court with direction that its order granting summary judgment should be vacated and the case remanded back to the State Court of Gwinnett County, Georgia. See 28 U.S.C.S. § 1447 ("If at any time before final judgment it appears that the district court lacks subject matter jurisdiction, the case shall be

remanded.")

This Court has sometimes remanded cases with inadequate jurisdictional pleading with instructions that the district court should engage in jurisdictional fact finding. *See e.g. Rolling Greens MHP, L.P. v. Comcast SCH Holdings L.L.C.*, 374 F.3d 1020, 1022-23 (11th Cir. 2004).

In this case, however, the Defendant has made no attempt to cure the deficiencies in its notice of removal or meet its burden of establishing jurisdiction. It did not and still has not responded to the Court's jurisdictional question. Under these circumstances, it is appropriate for this Court to remand to this case the district court with instructions to vacate its order and judgment and remand directly to the state court from which this case was improvidently removed.

## 2.    Court of Appeals Jurisdiction

This appeal is from an entry of summary judgment (Doc. 114) and final judgment (Doc. 115) of the district court. This Court has appellate jurisdiction pursuant to 49 U.S.C. § 1291.

This appeal is timely as judgment was entered on September 11, 2023 (Doc. 115) and the Plaintiff filed his notice of appeal on October 3, 2023, well within the thirty-day time limit provided by Federal Rule of

Appellate Procedure 4.

This appeal is from a final order and judgment disposing of all parties' claims.

## Statement of the Issues

Defendant/Appellee SAC contracted with a company called Maxim for the rental of a crane and for workers who could operate the crane as borrowed servants of SAC. Plaintiff/Appellant Antonio Hall was employed by Maxim, but he was not involved in SAC's use of the crane and was not SAC's borrowed servant. He was sent to pick up the crane when SAC was done with it and was injured while doing so.

The "statutory employer" defense only applies when a plaintiff is injured while in the employ of a defendant's "subcontractor" and while "engaged upon the subject matter of the contract to the same extent as [their] immediate employer." O.C.G.A. § 34-9-8 (a).

**Issue One:** Does the definition of "subcontractor" apply to an entity like Maxim, that rented a crane and loaned borrowed servants?

**Issue Two:** If Maxim was SAC's subcontractor, does the statutory employer doctrine apply even though the Plaintiff was not "engaged upon the subject matter of the contract to the same extent" as Maxim, his "immediate employer"?

### Statement of the Case

#### 1.    Introduction

In August of 2020, Appellee/Defendant SAC Wireless, LLC ("SAC") was removing and installing equipment on a 170-foot cell phone tower in Stone Mountain, Georgia. SAC failed to ensure that the high-voltage power lines at the worksite were disabled.

SAC also rented a crane and crane operator from a company named Maxim. When SAC was done using the crane, Maxim sent one of its employees, the Appellant/Plaintiff Antonio Hall ("Hall"), to pick up the crane and bring it back to Maxim's crane yard. Hall was not involved in any of the work SAC was doing and had only been sent by Maxim to retrieve the crane.

As the crane was being broken down for transport, part of the crane touched the live power lines, electrocuting Hall and causing severe injuries, including amputation of his right leg.

#### 2.    Course of Proceedings and Disposition Below

Hall filed his Complaint against SAC in the State Court of Gwinnett

County on November 24, 2021. Doc. 1-1.[1] The Complaint alleged that SAC was liable for negligence and for its violation of the Georgia High-voltage Safety Act.[2] *Id.*, *generally*, and at p. 9 ¶31. SAC removed the case to the United States District Court for the Northern District of Georgia on December 22, 2021. Doc. 1.

SAC filed its Answer on December 22, 2021 and asserted that it was the Plaintiff's statutory employer pursuant to O.C.G.A. § 34-9-8 and, therefore, Plaintiff's claims were barred under the exclusive remedy provision of Georgia's Workers' Compensation Act. Doc. 2 p. 2 (Ninth and Tenth Defenses). Following fact discovery, the parties filed cross-motions for summary judgment on SAC's statutory employer defense. Doc. 89;

---

[1] References to the record are to the docket entry in the district court's electronic filing system. Page numbers, including page numbers for deposition transcripts, are to the page number that appears in the header generated by the district court's electronic filing system.

[2] The High-voltage Safety Act is codified at O.C.G.A. §§ 46-3-30 through 46-3-40. Relevant here is that the Act prohibits the commencement of work near power lines unless the person responsible for the work (in this case, SAC) has given the power company notice of the work so that the power lines can be guarded or deenergized. O.C.G.A. § 46-3-33. The act provides for strict liability where, as happened here, its violation leads to injury. *Id.* at § 46-3-40.

Doc. 91.[3] In an Order dated September 11, 2023, the district court denied Hall's motion and granted summary judgment to SAC. Doc. 114. The sole basis of the summary judgment was the court's finding that SAC was entitled to immunity as Hall's statutory employer. Hall timely appealed. Doc. 116.

### 3.    Statement of the Facts

SAC is a general contractor in the business of installing and servicing antennas on cell phone towers. Doc. 90-3 p. 12:2-4; Doc. 90-4 p. 9:19-10:2, p. 12:2. This case arises from work it performed on a cell tower in Stone Mountain, Georgia to remove and install antennas and do some groundwork. Doc. 90-3 p. 17:13-15, p. 24:13-18, p. 30:8-32:14. Due to the layout of this particular job site, SAC decided to use a crane. Doc. 90-5 p. 32:2-12; Doc. 90-8 p. 24:23-25:6.

SAC does not use cranes for the majority of its work. Doc. 90-5 p. 31:10-12. SAC does not own cranes or employ crane operators, so when it needs to use a crane, it rents a crane, along with persons to operate the

---

[3] SAC also moved for summary judgment on other grounds but because the district court granted summary judgment on the statutory employer defense, the court did not address the remaining grounds. Accordingly, those grounds are not before the Court. Doc. 90.

equipment. Doc. 90-3 p. 13:5-10 (". . . we don't have in-house cranes or operators . . . We would rent them. . . we don't have anyone who can operate a crane. That's something that's completely contracted out.")

For the Stone Mountain job, SAC contracted with company called Maxim Crane Works, L.P. ("Maxim"). Doc. 90-1 ¶¶4 and 5. SAC and Maxim executed a "Short Term Service Agreement" that, per its terms, "constitut[ed] the full agreement between Maxim and [SAC]." Doc. 89-6 p. 2 at ¶15. It identifies SAC as the customer and was signed on behalf of SAC by a man named Josh Decesare. *Id.*; Doc. 90-5 p 36:1-25.

The Agreement specifies what is being provided:

- "Equipment" (i.e., Crane R1053 with a boom length of 223 feet);

- an Operator (here, a man named K.C.); and

- an Oiler (here, a man named Christian)[4]:

Significant for purposes of this appeal, the Agreement expressly provides that the Operator and Oiler would be borrowed servants of SAC.

---

[4] KC's full name is KC Cochran. Christian is Christian Edmonds. Doc. 90-1 ¶¶1 and 8.

Under Section One of the Agreement:

> . . . the Equipment and all persons **operating or maintaining** such Equipment including Maxim's employees, agents or independent contractors, are under Customer's exclusive jurisdiction, possession, supervision and control. . . . If Equipment is furnished with an operator, the services of such operator will be performed under the complete direction and control of Customer and operator **shall be considered Customer's employee** ...

Doc. 89-6 p. 2 at ¶1 (Emphasis supplied).

Thus, by its plain terms, the Agreement provides that all persons "operating" or "maintaining" the Equipment "shall be considered [SAC's] employee[s]." *Id*. The Agreement does not include or address other Maxim employees, such as the ones who deliver the crane or retrieve it once SAC is done with it.

At the job site, SAC used the crane and the employees it had borrowed from Maxim in a manner consistent with the terms of the contract. Doc. 90-1 ¶9. SAC's employees told the crane operator (Mr. Cochran) "when to lift, where to lift, and what to lift." Doc. 90-1 ¶9, Doc. 90-7 p. 13:17-21. Christian, as the oiler, assisted the operator. Doc. 90-1, ¶8; Doc. 90-5 p. 28:6-21; Doc. 90-7 p. 24:15-25:4. SAC's employees did all of the work on the tower, rigged the materials on the crane's hook, and when the crane

was being used, served as the required signal person.[5] Doc. 90-3, p. 17:13-17; Doc. 90-5, p. 28:6-21; Doc. 90-7 p. 24:15-25:4.

Consistent with the express language of the Agreement, everyone on the scene understood that SAC employed the operator and the oiler while the crane was in use. When K.C. Cochran and Christian Edmonds performed actions necessary to lift and lower equipment and people, they did so as SAC's employees - not as Maxim's employees. Moreover, SAC's employees considered the roles of both Maxim's crane and the operator as a tool. To wit: "So – you used a good term earlier saying that *the crane and the operator are a tool* . . . That's what – that's what *they* are. *They're a tool* to help us get stuff up and get stuff down." Doc. 90-3 p. 37:15-24; Doc. 90-8 p. 27:10-11 ("Q: Maxim was a provider of a tool, a crane? A: Yes"); Doc. 90-4, p. 13:23-14:1 ("Q: And the purpose of the crane at the jobsite would be to serve as a tool . . .? A: That would be correct.").[6]

---

[5] See generally 29 C.F.R. 1926.1419, which requires a signal person, sometimes referred to as the "spotter," to be provided by the entity in charge of crane movements.

[6] Maxim rents cranes as tools, analogous to ratchet wrenches, for use by others on their worksites. Doc. 90-3 p. 13:22, p. 48:3-12; Doc. 90-4 p. 13:23-14:1; Doc. 90-5 p. 29:5-12; Doc. 90-6 p. 7-8; Doc. 90-7 p. 13:14-16, p. 40:2-18; Doc. 90-8 p. 27:10-11; Doc. 90-1 ¶¶4, 6; Doc. 90-2 ¶7.

SAC finished using the crane by August 20, 2020. Doc. 90-1 ¶10. Maxim sent Plaintiff Hall to the jobsite to dismantle the crane and bring it back to Maxim's crane yard. Doc. 90-2 ¶10. By the time he arrived on the job site, the boom used to lift and lower SAC's employees and equipment had been retracted; that meant the crane could no longer be used to lift or lower things. Doc. 90-2 ¶11; Doc. 90-1 ¶10. Mr. Hall did not interact with SAC's employees. Doc. 90-7 p. 24:15-19 ("We don't tell them [i.e. Maxim employees] how to do their job. Only the crane operator and when we're using the crane is when we tell them.") He took no direction from them. *Id.* He received no assistance from them. Because SAC's work was done, no SAC employee acted as a signalman while Mr. Hall was dismantling the crane. Doc. 90-2 ¶11. Mr. Hall's tasks on the scene were no different than those of a driver for an equipment rental company dispatched to pick up a rented tool from a jobsite. Doc. 90-5 p. 34:4-18; Doc. 90-8 p. 39:13-21; Doc. 90-2 ¶18; Doc. 90-1 ¶12.

Plaintiff was walking around the crane doing his job when he happened to touch the crane at the exact same moment its load line contacted energized and unprotected power lines. Doc. 90-6 p. 81:5-16; Doc. 90-7 p. 17:13-18:6. This caused him to be electrocuted and suffer

severe injuries including the amputation of his right leg. Doc. 90-6 p.

71:5-7; 86:1-15.

## Summary of the Argument

**1.    The Plaintiff was not an employee of a "subcontractor."**

SAC can only be Hall's statutory employer if Hall's actual employer, Maxim, was SAC's "subcontractor." The word subcontractor has a specific meaning. It is one who takes on a portion of a contract entered into by another. That was true in 1920, when the statutory words at issue were enacted, and it remains true today.

Maxim did not take on any part of SAC's contract with a third party. Instead, it rented a tool, the crane, and provided an operator, who became a borrowed servant of SAC. A "vendor" of tools is not a "subcontractor." Neither is a "lending employer" who lends "borrowed servants" a subcontractor.

The district court erred by failing to acknowledge that, legally peaking, the operator is considered an employee of SAC during the time SAC was using the crane. *See e.g. Reaves v. Columbus Elec. & Power Co.*, 32 Ga. App. 140, 148, 122 S.E. 824, 827 (1924) ("...when one person lends his servant to another . . . the servant . . . must be dealt with as the servant of the man to whom he is lent . . .").

Hall, unlike the operator, was never the borrowed servant of SAC. To

the contrary, Hall never did anything in service of SAC. He was only there to pick up the crane for Maxim.

## 2. Plaintiff was not "engaged upon the subject matter of the contract to the same extent as the immediate employer."

In order to be the statutory employee of SAC, Plaintiff must have been not only "engaged upon the subject matter of the contract" but also must have been so engaged "to the same extent as the immediate employer." O.C.G.A. § 34-9-8 (a).

The district court erroneously concluded that Plaintiff was engaged upon the subject matter of the contract when he arrived on scene to remove the crane after SAC's work was done, and failed to consider whether Plaintiff was engaged *to the same extent* as Maxim, his immediate employer. *See* Doc. 114.  Contrary to the district court's conclusion, removal of the crane was not the subject matter of the contract. And, assuming arguendo that removing the crane was a *part* of the contract, Plaintiff's engagement in that discrete part of the contract did not make him engaged "to the same extent" as Maxim, his immediate employer.

16

<u>**Argument and Citation of Authorities**</u>

**1.    Maxim was not a Subcontractor of SAC.**

"A statute draws its meaning, of course, from its text." *Patton v. Vanterpool*, 302 Ga. 253, 254, 806 S.E.2d 493, 495 (2017) (Citation omitted.)

In Georgia, the "statutory employer" doctrine is codified at O.C.G.A. § 34-9-8 (a). When it applies, the statutory employer may be responsible for paying workers' compensation benefits. But in exchange for shouldering that responsibility, the statutory employer is rendered immune from other liability pursuant to the exclusive remedy provision of O.C.G.A. § 34-9-11. *See e.g. Manning v. Ga. Power Co.*, 252 Ga. 404, 405, 314 S.E.2d 432, 433 (1984) (explaining doctrine).

The text that defines when the statute applies provides that:

> (a) A principal, intermediate, or subcontractor shall be liable for compensation to any employee injured while in the employ of any of his subcontractors engaged upon the subject matter of the contract to the same extent as the immediate employer.

O.C.G.A. § 34-9-8 (a).

In order for the "statutory employer" defense to apply, each element set forth in the text of O.C.G.A. § 34-9-8 (a) must be satisfied.

17

To be clear, the issue presented by this case is not whether the doctrine exists (it does) or why it exists (this case does not require policy-making). The sole issue here is whether, under the facts construed in favor of the Plaintiff, SAC has established that the statutory employer defense applies as a matter of law.

## 1.1    The Court must apply the plain and ordinary definition of "Subcontractor"

When Georgia courts consider the meaning of a statute, they "presume that the General Assembly meant what it said and said what it meant." *Deal v. Coleman*, 294 Ga. 170, 172, 751 S.E.2d 337, 341 (2013) (citation omitted). They afford the statutory text its plain and ordinary meaning, view the statutory text in the context in which it appears, and read the statutory text in its most natural and reasonable way, as an ordinary speaker of the English language would. *Id.* at 294 Ga. 170, 172-73, 751 S.E.2d 337, 341 (2013) (citations and quotations omitted). By its plain terms, O.C.G.A. § 34-9-8 (a) only applies if Mr. Hall's employer, Maxim, was a "subcontractor" of SAC at the time he was injured. If Maxim was not SAC's subcontractor, then Hall was not an "employee injured while in the employ of any of [SAC's] subcontractors."

The word "subcontractor" is not defined in the Workers' Compensation

Act. But the word has a particular meaning both in legal usage and when used by ordinary English speakers. Georgia courts have looked to Black's Law Dictionary to define "subcontractor" as used in O.C.G.A. § 34-9-8 (a):

> A subcontractor, ... is one who takes a portion of the contract of the principal contractor or who agrees to perform an act with a person who has already contracted for its performance.

*W. Elec. Co. v. Capes*, 164 Ga. App. 353, 356, 296 S.E.2d 381, 384 (1982).

The linchpin of a subcontractor relationship is that the subcontractor is agreeing to undertake specific work that the other party has already promised to perform for another.

> [S]ince . . . this Code section is predicated upon the existence of the principal contractor-subcontractor relationship, this provision . . . is limited to those who contract to perform *certain work*, such as the furnishing of goods and services, for another, *and then sublet* in whole or part *such work*.

*Yoho v. Ringier of Am.*, 263 Ga. 338, 339, 434 S.E.2d 57, 58 (1993) (citing *Evans v. Hawkins*, 114 Ga. App. 120, 122, 150 S.E.2d 324, 326 (1966) (emphasis added)).

With respect to common usage, every homeowner who has endured a renovation project understands the concept of a subcontractor. For example, a homeowner hires a general contractor to install a new

19

kitchen. The general contractor, in turn, contracts with a plumber to move plumbing, an electrician to install outlets, a cabinet maker to build cabinets, and a painter to paint the walls. The plumber, electrician, cabinet maker, and painter are subcontractors and the homeowner knows that they are coming in and out of the house to perform various parts of the work the general contractor agreed to perform.

We can see that in order to meet the definition of "subcontractor," three elements must be present:

1.    A contract between two parties, Party A and Party B;

2.    A contract between Party B and Party C; and

3.    An overlap in the contracts between A and B and B and C.

It is this third element, the overlap, that makes C a subcontractor. C's obligation to B is to take on some portion of the promises B has already made to A.

Two recent decisions illustrate the point. In *Brack v. CPPI of Ga, LLC,* the Board of Education (Party A) entered a contract with CPPI (Party B) to build a school. *Brack v. CPPI of Ga., LLC*, 357 Ga. App. 744-45, 849 S.E.2d 521 (2020). The contract specifically required that CPPI complete the work in compliance with the applicable rules and regulations of

20

OSHA. *Id.* at 745. One of the OSHA regulations required toilets at the job site,[7] so CPPI entered into a contract with Tony's Johns (Party C) to provide "portable toilets and cleaning them once a week." *Id.* at 746. Because Tony's Johns was performing a part of the work CCPI had agreed to perform for the School Board, the Court of Appeals held that a contractor-subcontractor relationship was shown.[8]

Applying the plain language of the statute in a different context, a district court judge reached a different conclusion in *Felker v. Tyson Foods, Inc.*, 2018 U.S. Dist. LEXIS 185960, 2018 WL 5649897 (M.D. Ga. Oct. 31, 2018).

In *Felker,* grocery stores (Party A) contracted with Tyson foods (Party B) "to provide prepackaged chicken" *Id.* at *8. Tyson Foods hired ProLectric to do an electrical job at Tyson's chicken processing facility so it could produce prepackaged chicken. *Id.* at *1-2. The plaintiff was employed by ProLectric as an electrician and was injured while doing electrical work at the plant. *Id.* at *2.

Tyson claimed it was a statutory employer because it contracted with

---

[7] *Id.* at 748, fn. 16 (citing 29 C.F.R. § 1926.51(c)(1)).
[8] *Brack* was a 2-1 decision.

Prolectric to perform work that allowed its poultry plant to fulfill orders for prepackaged chicken. *Id.* at *8-9. But the district court correctly ruled that no contractor-subcontractor relationship existed between Tyson and ProLectric. Tyson contracted with grocery stores to make chicken products. Tyson did not contract with ProLectric to make chicken products or sublet any of its obligation to make chicken products to ProLectric. *Id.* at *9 (". . . Prolectric was not Tyson's subcontractor.")

In addition to the three requirements that are inherent in the definition of a subcontractor, the Georgia Supreme Court has defined "subcontractor" as the term is used in O.C.G.A. § 34-9-8 (a) to require the provision of "substantial services." *Gray Bldg. Sys. v. Trine*, 260 Ga. 252, 253 (1990).

In *Gray*, a general contractor contracted with David's Welding Service for custom measured lintels.[9] *Id.* at 252. The lintels had to be

---

[9] A lintel is the horizontal architectural feature above windows and doorways (shown in the photograph below):



fabricated on the work site from raw materials. *Id.* The plaintiff in the case was employed by David's Welding and was injured while in the process of unloading supplies to make the lintels at the work site. *Id.* The Georgia Supreme Court held that David's Welding was not a subcontractor even though it was fabricating the lintels on the worksite. *Id.* at 253. This is because fabricating the lintels was not a "substantial service" because it was a service in furtherance of supplying a product, not a task in furtherance of constructing the building because David's Welding did not install the lintels. *Id.*

### 1.2    Maxim was not SAC's Subcontractor

#### 1.2.1    Maxim did not contract to perform any part of SAC's contract.

The result in this case is controlled by the express language of the agreement between SAC and Maxim. Doc. 89-6. Nothing in that Agreement obligates Maxim to perform the work that SAC had agreed to perform for its customer. The Agreement only requires Maxim to provide a crane and a borrowed servant to operate it. Doc. 89-6. It does not require Maxim to do any particular task with respect to the cell tower. Instead, it requires Maxim to provide a tool for SAC to use, at SAC's discretion.

The district court did not identify any particular part of SAC's contract with its customer that had been assumed by Maxim. Instead, the district court found a subcontractor relationship existed because:

- Maxim "provided a crane to assist with hoisting workers and equipment to and from the tower in order to fulfill its own contract with its customer." Doc. 114 p. 7; and

- the project "could not have been completed without the crane and its operator lifting and lowering people and equipment." *Id.*

This, however, is not the test. This would perhaps be a different case if SAC had undertaken a contractual duty to use a crane. That would make this case analogous to *Brack*. But here, SAC was under no contractual duty to engage the services of Maxim. SAC had the sole discretion to decide whether to use a crane or not. Doc. 90-4 p. 15:19-16:9.

It is not enough that SAC used the crane and operator to "assist" with installing and removing antennas. Nor that it considered a crane to be an essential tool. If that were all that was required, the *Tyson* case would have been decided in error. Certainly, ProLectric's electrical work "assisted" Tyson in making chicken. Perhaps it was even necessary. But that is not enough. Here, Maxim did not contract to do any work to the

cell tower. And SAC had not entered into a contract with its customer to use a crane. As such, Maxim was not a subcontractor.

Here, again, it may have been a different case if SAC had contracted with Maxim to lift certain equipment. But SAC's contract with Maxim did not call for the performance of any particular work. Instead, it provided for the provision of a particular tool.

### 1.2.2   Maxim did not provide "substantial services" to SAC.

The record in this case shows that both the crane and the operator served as tools used by SAC to perform the work of lifting and lowering. Doc. 90-8 p. 27:10-11 ("Q: Maxim was a provider of a tool, a crane? A: Yes.); Doc. 90-3 p. 37:20-24. SAC's employees did the actual lifting work and used the crane and its operator as a tool.

Under Georgia law, the sale of goods does not make a party a subcontractor unless the sale is also accompanied by the provision of "substantial services" *Gray Bldg. Sys. v. Trine*, 260 Ga. 252, 253, 391 S.E.2d 764, 765 (1990). The same is true for the lessor or bailor of a crane.

Here, it may not be said that Maxim provided substantial services. With respect to the work SAC was engaged in, Maxim contributed no "services" at all.

In a footnote, the district court dismisses this testimony, finding that "the 'tool analogy' falls short here because Maxim provided not only the crane for use, but its employees to assist and further [SAC's] contract with its customer." Doc. 114 p. 8 at fn. 3. But the "tool analogy" was not merely a rhetorical device created by lawyers. The record shows that SAC viewed the crane - and its operator - as a tool SAC used to perform SAC's work. This creates, at the least, an issue of fact as to whether Maxim was providing "substantial services" to SAC.

### 1.2.3.    A lessor of borrowed servants is not the same thing as a contractor.

As the Georgia Supreme Court explained in *Tim's Crane,* "[T]he contract between the parties is controlling as to their responsibilities thereunder." *Tim's Crane & Rigging, Inc. v. Gibson*, 278 Ga. 796, 798, 604 S.E.2d 763, 765 (2004) (citation omitted). Here, the Agreement between SAC and Maxim did not create a contractor/subcontractor relationship; rather, it created a lessor/lessee relationship where SAC leased a crane and "borrowed" an operator and oiler to operate it. The district court erred in failing to recognize this distinction.

Just as the term "subcontractor" has a particular meaning in general use and under the law, so too does the concept of borrowed servants. The

terms describe two completely different arrangements, as explained by the United State Supreme Court eleven years before the passage of Georgia's Workers Compensation Act:

> It sometimes happens that one wishes a certain work to be done for his benefit and neither has persons in his employ who can do it nor is willing to take such persons into his general service. He may then enter into an agreement with another. If that other furnishes him with men to do the work and places them under his exclusive control in the performance of it, those men became pro hac vice the servants of him to whom they are furnished. But, on the other hand, one may prefer to enter into an agreement with another that that other, for a consideration, shall himself perform the work through servants of his own selection, retaining the direction and control of them.

*Standard Oil Co. v. Anderson*, 212 U.S. 215, 221, 29 S. Ct. 252, 254 (1909). Thus, at the time of the Act's first adoption, it was well recognized that borrowing servants and subcontracting are two distinct arrangements.

The General Assembly chose to limit O.C.G.A. § 34-9-8 (a) to those who were employed by subcontractors. It does not mention employees of employers who lend *other* employees to another. Expanding O.C.G.A. § 34-9-8 (a) to include contractual arrangements not specifically mentioned violates the omitted case canon - "the principle that what the text does

not provide is unprovided." Scalia, A. and Garner, B., Reading Law – The Interpretation of Legal Texts, (2012), p. 93. *See e.g. Patton v. Vanterpool*, 302 Ga. 253, 256, 806 S.E.2d 493, 496 (2017) (although artificial insemination and in-vitro fertilization both aim for pregnancy, the procedures are distinct and a statute that refers to artificial insemination does not include in-vitro fertilization).

Turning to the facts of the present case, we see that there can be no dispute that the operator of the crane, while it was being used by SAC, was a borrowed servant of SAC. *See Tim's Crane & Rigging, Inc. v. Gibson*, 278 Ga. 796, 797-98, 604 S.E.2d 763, 765 (2004). In *Tim's Crane*, a crane operator was nominally employed by a company named Tim's Crane. But at the time he made a mistake, he was working for a contractor named Pinkerton at a construction site. *Id.* at 796. The question presented was whether the operator was a borrowed employee of Pinkerton - a finding that would protect Tim's Crane from liability - or not. The Georgia Supreme Court looked to the contract between Tim's Crane and Pinkerton:

> The requirements for the borrowed servant
> doctrine to apply are well settled in this state:

28

> [I]n order for an employee to be a borrowed employee, the evidence must show that "(1) the special master had complete control and direction of the servant for the occasion; (2) the general master had no such control, and (3) the special master had the exclusive right to discharge the servant."

*Id.* at 797-98.

Here, the contract between Maxim and SAC provides that "all persons operating or maintaining [the] Equipment . . . are under Customer's exclusive jurisdiction, possession, supervision, and control." Doc. 86-9 p. 2 at ¶1. It further provides that "If Equipment is furnished with an operator, the services of such operator will be performed under the complete direction and control of Customer and operator shall be considered Customer's employee for all purposes other than the payment of wages, worker's compensation, and their benefits." *Id.* Consistent with this contractual language, the facts show that SAC did exercise complete control over the operator while he operated the crane.

The relationship between SAC and Maxim was not one of contractor/subcontractor. It was one of crane lessor/servant lender and crane lessee/servant borrower. These relationships are not ones which give rise to statutory employer immunity under O.C.G.A. § 34-9-8. As the

Georgia Court of Appeals colorfully noted, the words of statutes must be given their specific meaning:

> "When I use a word it means just what I choose it to mean: neither more nor less" said Humpty Dumpty to Alice in Louis Carroll's enchanting classic "Through the Looking Glass." Humpty Dumpty's etymological directive does not apply in construing statutes where words have a specific meaning derived from dictionaries and decided cases.

*Winston Corp. v. Park Elec. Co.*, 126 Ga. App. 489, 494, 191 S.E.2d 340, 344 (1972).

### 1.2.4    The district court failed to recognize the crane's operator was a borrowed servant of SAC.

The district court's order found that "the work performed by *Maxim* [was] lifting workers and equipment to and from the cell phone tower" Doc. 114 (emphasis added). But in finding that "Maxim" lifted workers and equipment, the district court failed to recognize that the crane's operator was, for legal purposes, a borrowed servant and thus an employee of SAC while he was lifting for SAC. So, while the crane was lifting for SAC, Maxim was not operating the crane, SAC was.

### 2.    Plaintiff was not engaged upon the subject matter of the contract to the same extent as the immediate employer.

Even if Maxim was SAC's subcontractor, the statute would not apply

unless SAC could also show that Plaintiff was "engaged upon the subject matter of the contract to the same extent as the immediate employer." O.C.G.A. § 34-9-8. This creates two requirements. First, Plaintiff had to have been engaged in the subject of Maxim's contract. Second, he had to be "engaged upon the subject matter of the contract to the same extent as" Maxim, his immediate employer. This relationship between Plaintiff's activities and the relevant contract does not exist. Plaintiff's sole activity was arriving at the job site to retrieve the crane after SAC was done using it.

Because all crane work had been completed when he arrived, Plaintiff was not in any way engaged in the performance of SAC's work for its customer, or Maxim's work - to the same extent it may be said that Maxim did work - for SAC. Doc. 90-1 ¶¶10, 13; Doc. 90-2 ¶¶10, 11, 18; Doc 90-5 p. 27:7-12; Doc. 90-6 p. 37:5-9, 43:11-21.

Plaintiff was not engaged in the subject matter of Maxim's contract at all. In fact, Plaintiff's work dismantling the crane could not even begin until all crane work performed by SAC had been completed. Maxim loaned a crane and an operator. Plaintiff's work in retrieving the crane after its use was certainly to a lesser, not same, extent as Maxim's.

Nor did Plaintiff do anything related to the core subject matter of the job being done by SAC - installing antennas on the tower. Doc. 90-5 p. 27:7-12; Doc. 90-6 p. 37:5-9, 43:11-21; Doc. 90-1 ¶¶6, 7, 10, 13; Doc. 90-3 p. 30:4-7. Plaintiff absolutely did not lift or lower anything up and down a cell phone tower or do "man basket work." Doc. 90-1 ¶7, 10, 13, 14; Doc. 90-3 p. 17:13-18:12, 41:11-21, 40:16-24; Doc. 90-5 p. 28:6-21, p. 49:18-49:1; Doc. 90-7 p. 13:22-25, 24:15-25; Doc. 90-2 ¶10, 18; Doc. 90-6 p. 43:16-21. Plaintiff did not even provide services to keep the crane in an operable condition. Doc. 90-5 p. 49:18-50:1; Doc. 90-6 p. 37:5-12; Doc. 90-1 ¶10.

Plaintiff was not even on the work site when any of the tasks essential to the subject matter of Maxim's contract with SAC were performed. Doc. 90-1 ¶¶10, 13; Doc. 90-2 ¶¶10, 18. Instead, when Plaintiff arrived at the worksite, the crane was no longer being, or capable of being, used as a tool by SAC. Doc. 90-2 ¶11; Doc. 90-1 ¶10.

Unlike like the operator, Plaintiff was not a borrowed servant of SAC. Pursuant to the contract between Maxim and SAC, only someone involved in "operating or maintaining" the crane was under SAC's control. Doc. 86-9 p. 2 at ¶1. And in practice, no one with SAC directed Plaintiff as he went about his work of retrieving the crane. Doc. 90-1.

Plaintiff was not involved in the provision of the crane or the lending of the operator. He was merely a pickup man retrieving a rented tool - here a crane. Doc. 90-5 p. 34:4-18; Doc. 90-6 p. 35:5-18; Doc. 90-8 p. 39:13-21, 40:6-19; Doc. 90-2 ¶18; Doc. 90-1 ¶12.

The Georgia cases applying O.C.G.A. § 34-9-8 are illustrative. For while there are many cases where general contractors have successfully asserted the statutory employer defense, all of them adhere to the text of O.C.G.A. § 34-9-8. In each instance where coverage was found, the employee was actively engaged in the subject matter of his employer's contract with the general contractor and the employees whose claims were barred offered no evidence to the contrary.

In *Int'l Leadburning Co. v. Forrister*, 213 Ga. App. 558 (1994) the defendant/general contractor contracted with the plaintiff's employer for a crane and operator to lift a heavy kettle onto a truck. The opinion does not provide a description of the contract for the crane work or a description of how the work occurred, but nothing in the opinion suggests that the situation was similar to the one here.

The plaintiff in the *Forrister* case was the operator of the crane and was injured while hoisting the kettle onto the truck. The court held that

"[the] defendant subcontracted with [the plaintiff's employer] to complete its contract with Kemira," and the plaintiff "was injured while engaged upon the subject matter of the contract … ." *Id.* at 559.

*Landrum v. Cobb County Concrete Prods.*, 191 Ga. App. 805, 380 S.E.2d 726 (1989) also involved a general contractor who hired a crane company to hoist something, namely, concrete. The crane company supplied a crane and a crane operator, Mr. Landrum. Mr. Landrum was killed while operating the crane to hoist the concrete. Just as in *Forrister*, the plaintiff sustained an injury while actively engaged in the work his employer contracted to do for the general contractor.

*Carr v. FedEx Ground Package Sys., Inc.*, 317 Ga. App. 733, 733 S.E.2d 1 (2012) is a case in which the contract being analyzed was the general contractor's contract with its customers. The plaintiff's employer, J. Wiggins Trucking, had a contract with FedEx to provide trucking services. As a delivery driver, Mr. Carr was engaged in the subject matter of his employer's contract to the same extent as his employer and the goal of each was to deliver goods by truck. As a result, his tort claim was barred because "FedEx argues, and we agree, that the work performed by Wiggins [Carr's employer] - package delivery - was done in

performance of contracts FedEx had with others (FedEx's customers), and thereby was analogous to the trucking company's work in Patterson." *Id.* at 738, 11. That was truly a general/subcontractor relationship.

The *Patterson v. Bristol Timber Co.* 286 Ga. App. 423, 649 S.E.2d 795 (2007) case, to which the *FedEx* court refers, involved a plaintiff whose employer, a company called Brownlow, had a contract with Bristol Timber to haul wood chips. Mr. Patterson was a Brownlow driver and was injured in the process of doing the work for which Bristol contracted with Brownlow. Again, the level of Brownlow's engagement was the same as his employer's. As a result, O.C.G.A. §34-9-8 applied.

In *Finley v. Lehman*, 218 Ga. App. 789, 789-90, 463 S.E.2d 709, 710 (1995), Lehman hired Quality Home Builders, Inc., to construct sewer and water lines. Finley was employed by Quality Home Builders and was engaged in the installation of one of the sewer lines when he was injured.

In contrast, Plaintiff's work dismantling the crane so it could be returned to Maxim is not similar to the work being done by the plaintiffs in the cases discussed above. Each of those men were engaged in the subject matter of the contract entered into by their employers. They were lifting, moving, delivering, hauling, installing a sewer, etc. Also, the work

they were doing for their employers was work the respective defendants had to have accomplished to meet their own obligations - hauling chips, delivering packages, and lifting things.

We see an application of the "engaged upon the subject matter of the contract" language in *Brack v. CPPI of Ga., LLC*, 357 Ga. App. 744, 849 S.E.2d 521 (2020). Mr. Brack was injured while cleaning jobsite toilets that his employer had contracted to supply, clean, and maintain. As noted above, the majority found that his employer was a contractor because the provision of clean, maintained toilets was required under the master contract and then subcontracted to Mr. Brank's immediate employer. Mr. Brack had visited the worksite and cleaned the toilets on a regular basis from the autumn of 2014 through his injury in April of 2015. The court therefore noted that:

> [T]he cleaning and maintaining of the portable toilets on the CMR site by TJ [Brack's employer] for the use of the CPPI's employees was in furtherance of the subject matter of the CMR contract. Based on the foregoing, the contract between TJ and CPPI was for the delivery of the portable units and the substantial services regarding the continuous, periodic service and maintenance of the portable toilets at the CMR site.

(Emphasis supplied). *Id*. at 748, 525.

36

Here, in contrast, Plaintiff was not involved in anything related to the cell tower, or SAC's work at the cell tower, or to the provision of the crane and loaned operator to SAC.

## 2.1    The district court did not apply the statute as written.

The district court did recognize that "for the statutory employer doctrine to apply, the injured employee must be engaged upon the subject matter of the contract." Doc. 114 p. 8. However, the district court ignored and did not address the requirement that Plaintiff's engagement must be "to the same extent as the immediate employer."

It is not clear whether the failure to address the "to the same extent" requirement was a failure to address that requirement or if the Court was reading the requirement out of the statute. Either way, this requirement may not be ignored. A statute should be construed so that no provision is superfluous. *Corley v. United States*, 556 U.S. 303, 314, 129 S. Ct. 1558, 173 L. Ed. 2d 443 (2009).

Rather than explaining how Plaintiff was engaged upon *the subject matter* of the contract (to the same extent as the immediate employer), the district court found the statute was satisfied because "disassembling the crane [was] as much a part of the contract as the hoisting activities"

and "the removal of the crane [was] in furtherance of the contract." Doc. 114 p. 9. But these are not the standard. The words "engaged upon the subject matter of the contract to the same extent as the immediate employer" do not mean the same thing as "engaged upon a part of the contract" or "engaged upon an activity that was in furtherance of the contract."

## **Conclusion**

SAC is unable to meet its burden of showing the Statutory Employer defense applies as a matter of law. The situation presented by the record of this case fails to satisfy the necessary requirements of the relevant statutory text. Indeed, the record shows that summary judgment in favor of Hall is required on this issue. For this reason, this Court should reverse the grant of summary judgment by the district court and remand with instructions to enter summary judgment in favor of Hall on the statutory employer issue.

This 12th day of January, 2024.

Warshauer Woodward Atkins LLC

By: _/s/Trent Shuping_
Michael J. Warshauer
Trent Shuping
William J. Atkins
2740 Bert Adams Road
Atlanta, GA 30339
404-892-4900
mjw@warlawgroup.com
tss@warlawgroup.com
bill@warlawgroup.com

*Attorneys for Plaintiff/Appellant
Antonio Hall*

## Certificate of Compliance

I, Trent Shuping, certify that this brief complies with the rules set forth in Fed. R. App. P. 32()(7)(B) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f):

This brief contains 7,484 words.

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using 14-point, Century Schoolbook font.

In preparing this certificate, I relied on the word count of the word-processing system used to prepare this brief, Microsoft Word 2018.

Dated:  January 12, 2024.

Warshauer Woodward Atkins LLC

By:  */s/Trent Shuping*
Trent Shuping

*Attorney for Plaintiff/Appellant*

40